IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MICHELLE SCHURG and DANIEL SCHURG,<br><br>             Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>             Defendant. | Lead Case No.<br>CV 20–61–M–DWM<br><br>Member Case Nos.<br>CV 20–62–M–DWM<br>CV 20–63–M–DWM<br>CV 20–64–M–DWM<br>CV 20–65–M–DWM<br>CV 20–66–M–DWM<br>CV 20–67–M–DWM<br>CV 20–90–M–DWM<br><br>OPINION<br>and ORDER |

This action involves many consolidated cases arising out of the Lolo Fire

("the Fire"), which took place during July and August 2017. The concerned

plaintiffs are Michelle and Daniel Schurg, Beccie and Chad Miller, Jackie Lowe,

Maureen and Larry Ernst, Joleen and Ronnie Harvie, Mark Stermitz, Michelle

Stermitz, and Brian O'Grady (collectively, "Plaintiffs"). Here, Plaintiffs whose

property included a house are referred to as "the Residential Plaintiffs." This

designation includes all Plaintiffs except O'Grady. As stated in the previous order,

(Doc. 57), Plaintiffs make claims sounding in intentional tort and negligence

against the United States Department of Agriculture and the United States Forest

Service, collectively referred to as "the Government." It is worth noting that the

law Plaintiffs relied on when the case was filed was subsequently clarified in a way

that undermines their cases. *See Esquivel v. United States*, 21 F.4th 565, 573 (9th Cir. 2021).

Both the Government and the Plaintiffs filed multiple motions for summary judgment, (Docs. 17, 20, 29),[1] and an argument at a motion hearing was held on January 26, 2022. Following the hearing, the Government's motions for summary judgment were granted, while Plaintiffs' motion for summary judgment was denied. (Doc. 57.) Consistent with that order, the Government's motions were granted for the reasons set forth below, and judgment is entered in its favor.

## BACKGROUND

The following facts are undisputed unless otherwise noted. (*See* Docs. 19, 22, 24, 31, 34); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

## I.      Development of the Fire

On July 15, 2017, lightning struck 10 miles southwest of Lolo and 6 miles up the South Fork Lolo Creek drainage area and ignited the Fire. (Doc. 34 at ¶ 1.) Because of the terrain, the Lolo National Forest Supervisor determined that the safest way to manage the Fire was through an "indirect strategy," meaning that firefighters wait and prepare for the fire to reach safer terrain before actively fighting it. (*Id.* ¶¶ 3–4.) The Supervisor placed an order for a Type 1 Incident Management Team ("the Team"), indicating that the fire represented the most

---

[1]All citations are to the lead case, 9:20-cv-61-M-DWM, unless otherwise noted.

complex type of incident. (*Id.* ¶¶ 5–6.) The Team was ordered because such teams "excel at long-term planning and public communication." (*Id.* ¶ 9.) Plaintiffs do not dispute that such teams generally excel at these activities, but they dispute that the Team here lived up to this expectation. (*Id.*)

On July 21, the Northern Rockies Coordination Center assigned Incident Commander Greg Poncin's Team to the Fire, and Poncin accepted delegated authority to manage the Fire from the Lolo National Forest Supervisor. (*Id.* ¶¶ 11–12.) On July 29, the Bitterroot National Forest and Montana Department of Natural Resources delegated authority to Poncin. (*Id.* ¶ 13.) Also on July 29, the Team internally circulated a "Structure Protection Plan for Macintosh Manor" that was prepared with the help of the Forest Service. (*Id.* ¶ 29.) The Plan included assessments for 900 properties, including Plaintiffs', and labeled each property as one of four categories: Defensible, Standalone; Defensible, Prep and Leave; Defensible, Prep and Hold; or Non-Defensible, Prep and Leave. (*Id.* ¶¶ 29–30; *see also* Doc. 21-1 at 6–121.) While Plaintiffs note that the information in the assessments "would have been valuable" to them before fire reached their properties, they do not dispute that the purpose of the assessments was to assist firefighters in the event the fire eventually threatened residential areas. (Doc. 34 at ¶ 32.) In fact, such assessments are not public documents and are not provided to homeowners unless specifically requested. (*Id.* ¶ 33.)

By August 1, the Fire had increased in size while growing northward so that it encompassed over 5,000 acres. (*Id.* ¶ 35.) The Team described the growth of Fire in daily website posts available to the public on the Forest Service's website, "InciWeb." (*Id.* ¶ 36.) On August 3, Noel Livingston took over as the Incident Commander of the Team due to federal work/rest guidelines. (*Id.* ¶ 38.) On August 4, Lolo National Forest staff provided a decision document that considered current fire conditions and included updates to the Management Action Points established in previous decisions. (*Id.* ¶¶ 41–42.) Between August 4 and August 10, the Fire continued to grow northward, in the general direction of Plaintiffs' properties. (*Id.* ¶ 44.)

## II.   Damage to Plaintiffs' Properties

Between August 13 and August 17, the Fire developed and damaged Plaintiffs' properties. While the facts for each individual Plaintiff are outlined separately below, a few facts are common to all Plaintiffs. First, at 10:00 p.m. on August 16, the Missoula County Sheriff's Office issued an evacuation order to residents in the area that included Plaintiffs' properties. (*Id.* ¶ 77.) Second, during this general period, the Team utilized "firing operations," or backburns, which is "the controlled application of fire between established containment lines and an active fire front." (Doc. 18 at 7.) Finally, the Government does not generally dispute that Plaintiffs were injured and that their properties were damaged; rather,

the Government disputes the severity and extent of Plaintiffs' damages and denies
any liability for those damages.

### A.   O'Grady (Case No. 9:20-cv-90-M-DWM)

Plaintiff Brian O'Grady is a Colorado resident, and he was residing in
Colorado during the Fire. (Doc. 34 at ¶ 52.) He purchased the property at issue in
2013 and visited it two or three times a year. (Doc. 31-23 at 7.) On the evening of
August 13, the Fire spread onto the easternmost section of his land. (Doc. 34 at
¶ 47.) The parties dispute the depth of O'Grady's knowledge, but they do not
dispute that he had knowledge of the Fire from its inception. (*Id.* ¶ 53.) In fact,
O'Grady was driving to Montana when he found out about the Fire, (Doc. 31-23 at
7), and between mid-July and August 17, O'Grady checked InciWeb "most days"
for updates, (Doc. 34 at ¶ 131).

Additionally, "[t]he United States identified [O'Grady] as a landowner likely
to be impacted by the Fire and possessed Mr. O'Grady's telephone number on the
[Incident Management Team]'s contact list." (*See* Doc. 21 at 3; *see also* Doc. 21-
2.) But O'Grady contends that the Forest Service "began aerial and ground firing
operations on [his] property without notifying or informing him at any time." (*See
O'Grady v. United States*, 9:20-cv-90-M-DMW (Doc. 1 at ¶ 21).) The
Government admits that, on August 14, it made the decision to conduct firing
operations, (Doc. 32 at ¶ 20)), but the Government asserts that firing operations did
not actually occur on O'Grady's land until August 17, (*id.* ¶ 32). While the

Government disputes whether it had a duty to contact O'Grady, it does not dispute that it did not contact him before conducting the firing operations. (Doc. 32 at ¶ 21.) And, unlike the other Plaintiffs, the Government acknowledges that it conducted firing operations directly on O'Grady's property. (*See* Doc. 19 at ¶¶ 18, 21.) O'Grady argues that these operations "destroyed [his] forested lands, roads, culverts, and real property." (*O'Grady*, Doc. 1 at ¶ 23.)

### B.     Schurg Property (Case No. 9:20-cv-61-M-DWM)

At all the times relevant, Michelle and Daniel Schurg resided at 16252 Folsom Road. (Doc. 1 at ¶ 1.) Unbeknownst to the Schurgs, their home had been designated as "Defensible, Stand Alone" at the time of the Fire. (*Id.* ¶¶ 11, 13.) On August 17, the Schurgs disregarded the evacuation order and did not evacuate, despite the encroaching fire, and instead remained on their property and defended their home. (Doc. 18-1 at 9.) The Schurgs allege that, as they fought the Fire,[2] firefighters with the Forest Service observed their efforts but did nothing to help. (Doc. 31-37 at 34.) The Schurgs saved their home, but portions of their property burned and they "discovered burn holes in their deck." (Doc. 1 at ¶ 65.)

### C.     Miller Property (Case No. 9:20-cv-62-M-DWM)

At the times relevant, Chad and Beccie Miller resided at 16485 Folsom Road. (*See Miller v. United States*, 9:20-cv-62-M-DWM (Doc. 1 at ¶ 1).)

---

[2] Both Schurgs have wildland firefighting experience. (*See* Doc. 1 at ¶ 79; Doc. 31-37 at 5.)

6

Unbeknownst to the Millers, their home was designated as "Defensible, Stand Alone" during the time of the Fire. (*Id.* ¶¶ 11, 14.) On the night of August 16, 2017, the Millers received notice that they had to evacuate. (Doc. 34 at ¶ 142.) However, Mrs. Miller did not receive notice from the Forest Service, but from her daughter, who was apparently informed by the Millers' neighbors. (Doc. 31-30 at 8.) At the time of the evacuation notice, Mr. Miller was away, so Mrs. Miller called him to tell him about the evacuation order. (*Id.*) Mrs. Miller and her daughter evacuated from their home and allegedly experienced significant difficulty evacuating the Millers' animals, which included pigs, chickens, dogs, horses, and goats. (Doc. 31-30 at 15–16.) Although the Millers' home did not completely burn, it sustained smoke and heat damage, and parts of the property and fencing were destroyed. (*See Miller*, Doc. 1 at ¶¶ 37, 39.)

### D.      16595 Folsom Road: Stermitz and Lowe Property

Three Plaintiffs are tied to this case by the property at 16595 Folsom Road: Jackie Lowe (*Lowe v. United States*, 9:20-cv-63-M-DWM); Mark Stermitz, (*Stermitz v. United States*, 9:20-cv-66-M-DWM ("*Stermitz I*")); and Michelle Stermitz, (*Stermitz v. United States*, 9:20-cv-67-M-DWM ("*Stermitz II*")).   Lowe and Mark Stermitz were married but separated in the summer of 2017, and Michelle Stermitz is their daughter. (*See Schurg,* Doc. 31-33 at 4.) Unbeknownst to any of these Plaintiffs, the property at 16595 Folsom Road was designated as

"Non-Defensible, Prep and Leave" during the time of the Fire. (*See Stermitz I* (Doc. 1 at ¶¶ 11, 13).)

Lowe received notice of the evacuation order on the evening of August 16, 2017, apparently from Mrs. Miller. (Doc. 31-32 at 15.) Michelle Stermitz drove to the residence and helped her mother evacuate as the fire approached. (Doc. 31-34 at 9.) Mark Stermitz was not in Missoula at the time, and he first learned about the threat when Michelle Stermitz called him. (Doc. 31-33 at 15.) Ultimately, fire destroyed the home, the shop, and real and personal property. (*Id.* at 20.)

### E.    Ernst Property (Case No. 9:21-cv-64-M-DWM)

At all times relevant, Larry and Maureen Ernst resided at 16575 Folsom Road. (*Ernst v. United States*, 9:21-cv-64-M-DWM (Doc. 1 at ¶ 1).) Unbeknownst to them, their home was designated as "Non-Defensible, Prep and Leave" during the time of the Fire. (*Id.* ¶¶ 16–17.) The Ernsts attended three or four in-person, public meetings between the end of July 2017 and August 17, 2017, and regularly visited the fire information station. (Doc. 34 at ¶¶ 137–38.) Mrs. Ernst also monitored InciWeb daily. (Doc. 31-40 at 12.) Late on August 16, Mrs. Ernst received a call notifying her of the evacuation order. (*Id.* at 10.) The Ernsts packed some possessions and loaded their pets into vehicles, and around 11:30 p.m. a sheriff arrived at their property, advising Mr. Ernst that the road to the Ernst's property would close around 3:00 a.m. (Doc. 31-39 at 11.) The Ernsts evacuated in the early hours of August 17, but Mr. Ernst returned in defiance of the

evacuation order to photograph the property. (Doc. 34 at ¶ 85.) Ultimately, the fire destroyed the Ernsts' home, (*Ernst* (Doc. 1 at ¶ 34)), their metalworking shop, woodworking shop, and personal and real property, (Doc. 31-39 at 6).

### F.    Harvie Property (Case No. 9:20-cv-65-M-DWM)

At all times relevant, Ronnie and Joleen Harvie resided at 16490 Folsom Road. (*Harvie v. United States*, 9:20-cv-65-M-DWM (Doc. 1 at ¶ 1).) Unbeknownst to the Harvies, the Forest Service designated their home as "Defensible, Stand Alone" at the time of the Fire. (*Id.* ¶¶ 11–12.) The Harvies received the evacuation order late on August 16 and left their home around 2:00 a.m. on August 17. (Doc. 31-35 at 9.) Their home survived, but their real property was significantly damaged, and they lost personal property. (Doc. 23-16 at 3–4.)

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, it is the court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether the evidence demonstrates a genuine issue of material fact." *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001). Each motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016).

ANALYSIS

Plaintiffs' claims nestle into one of two categories: intentional torts or negligence.  From a bird's eye view, the intentional tort claims are grounded in the allegation that the Forest Service intended fire to be on or travel onto Plaintiffs' properties as a result of the August 17 firing operations.  By contrast, the negligence claims are largely based on the allegation that the Forest Service failed to provide notice or warnings to Plaintiffs informing them that their properties and/or homes were at risk because of the Fire, despite the Forest Service allegedly possessing the knowledge of the risk and the ability to communicate it.

Summary judgment is granted for the Government across the board, primarily because the Government's communication methods are immunized by the discretionary function exception.  Moreover, the undisputed facts show that the Government had the legal right to conduct firing operations on O'Grady's property; the Government did not intend for fire to travel or remain on the Residential Plaintiffs' properties; and the record shows that any emotional distress Plaintiffs suffered does not rise to the "serious or severe" threshold.

## I.  Negligence

"An action can be brought by a party against the United States only to the extent that the Federal Government waives its sovereign immunity." *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996).  Under the Federal Tort Claims Act ("FTCA"), "[t]he United States and its agents can . . . be held liable with

10

respect to tort claims 'in the same manner and to the same extent as a private individual under like circumstances.'" *Esquivel*, 21 F.4th at 573 (quoting 28 U.S.C. § 2674). But the discretionary function exception to the FTCA maintains the Government's immunity from suit for any claim based on a government employee's action or inaction related to "a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved [was] abused." 28 U.S.C. § 2680(a).

Plaintiffs believe the discretionary function of the FTCA does not apply and that because there are no material disputes of fact on the Plaintiffs' negligence claims, they are entitled to judgment as a matter of law. (*See generally* Doc. 21.) Instead of basing their claims in the Government's methods for conducting firing operations or fire suppression efforts, Plaintiffs' negligence claims focus on the Government's failure to provide notice or otherwise communicate with Plaintiffs about fire management. (*See id.* at 2–3.)[3] The Government agrees that there are no material disputes of fact, but it argues that the discretionary function applies, and so summary judgment in the Government's favor is appropriate because this Court lacks jurisdiction. (*See generally* Doc. 30.)

---

[3] To the extent Plaintiffs' negligence claims are grounded in "negligent firefighting" or the allegation that the Forest Service should be liable for conducting firing operations because a private person would be liable for such conduct, (*see* Doc. 21 at 6–9), the claims fail because it is well-settled that fire suppression methods fall within the discretionary function exception. *See Esquivel v. United States*, 21 F.4th 565, 574 (9th Cir. 2021) (collecting cases).

While the applicability of the discretionary function exception was a more open question at the time this case was filed—and even when summary judgment briefing was underway—the Ninth Circuit's recent decision in *Esquivel v. United States*, 21 F.4th 565 (9th Cir. 2021), together with the Ninth Circuit's decision in *Green v. United States*, 630 F.3d 1245 (9th Cir. 2011), establish parameters within which Plaintiffs' claims fall.  A two-step process determines whether the discretionary function exception applies: "[f]irst, courts must determine whether the challenged actions involve an element of judgment or choice." *Esquivel*, 21 F.4th at 573 (quotation marks omitted).  If the element of judgment or choice is present, "the court moves to the second step and must determine whether that judgment is of the kind that the discretionary function exception was designed to shield.  Namely, the exception protects only governmental actions and decisions based on social, economic, and political policy." *Id.* at 574 (quotation marks and citation omitted).  If the action involves either judgment or choice, and it sounds in policy, the "action is immune from suit—and federal courts lack subject matter jurisdiction—even if the court thinks the government abused its discretion or made the wrong choice." *Id.* (quotation marks omitted).  "The plaintiff has the burden of showing there are genuine issues of fact as to whether the exception should apply, but the government bears the ultimate burden of establishing the exception applies." *Id.* (quotation marks omitted).

"[C]laims involving how the government conducts fire suppression operations are generally barred by the discretionary function." *Id.* (collecting cases). But until the Ninth Circuit's recent decision in *Esquivel*—and at the time the parties' briefed the issue—it was unclear to what extent communications surrounding fire suppression efforts were also immunized. *Esquivel* clarified that "[a] communication between fire crews and property owners is . . . covered by the discretionary function exception under 28 U.S.C. § 2680(a) if such communication was based upon the performance of fire suppression operations." *Id.* at 576. Thus, determining whether the discretionary function applies to Plaintiffs' claims that the Forest Service was negligent in failing to issue an evacuation warning before the evacuation order involves the familiar two-step inquiry, as informed by *Esquivel*: (1) did the decision not to notify Plaintiffs of the possibility of evacuation involve an element of judgment or choice, and (2) if so, whether that decision was based upon the performance of fire suppression operations. *See id.*

## A.    Element of Judgment or Choice

The first inquiry is whether the communication between the Government and Plaintiffs involved an element of judgment or choice. "An agency must exercise judgment or choice where no statute or agency policy dictates the precise manner in which the agency is to complete the challenged task." *Green*, 630 F.3d at 1250. Here, Plaintiffs point to the Forest Service's "Deliberate Risk Management Analysis Worksheets," which state the Forest Service is to "use

established [Management Action Points] to anticipate and order evacuations proactively, continue good relationships with public. . . [and] use modeling and broadcast forecasts insuring positive communication." (Doc. 22 at ¶ 37.) In light of this direction, Plaintiffs argue that the Forest Service's decision to issue an evacuation order—but not an evacuation notice that provided Plaintiffs more time to prepare—directly contradicted binding, thus nondiscretionary, instructions.

The Government, by contrast, argues that the type of information Plaintiffs insist they should have received—namely, that their properties might be threatened by the Fire—was readily available to them, and Plaintiffs' claim really takes issue with the method of communication. (Doc. 30 at 38–39.) In addition, the Government points to evidence in the record related to the Forest Service's communication initiatives. (*See* Doc. 31 at ¶¶ 27–28.) For example, in the earliest stages of the Team's involvement with the Fire, the Team issued the "Lolo Peak Incident Decision," which articulated objectives for the Forest Service in attacking the Fire. (*See* Doc. 31-7.) "Communications" objectives, as stated in that decision, include the "communicat[ion] [of] appropriate information with the appropriate . . . landowners." (*Id.* at 19.) In addition, the decision states an objective to

> [a]ssure that relationships are maintained and enhanced with private land owners in the Florence and Lolo community, Bitterroot and Lolo NF personnel, elected officials, and other agencies involved in the fire effort. Place emphasis on ensuring media messages are accurate, timely

and positive and facilitate information in response to local concerns regarding impacts from the fire to the residents.

(*Id.* at 20.)  Subsequently, the Team issued another Incident Decision on August 4, 2017.  This decision reiterates the same communication objective noted above, (*see* Doc. 34-8 at 22), and also states that "[t]he location, timing, and behavior of the fire will dictate the location and priority of the zone evacuation," (*id.* at 37).

The record memorializes how the Team's firefighting strategy and communication about that strategy evolved.  The Worksheets to which Plaintiffs cite state that the Forest Service should "anticipate and order evacuations proactively."  (Doc. 22 at ¶ 37.)  This direction says nothing about "warning" of evacuations, nor does it set a timeline for what it means to be "proactive."  Thus, adhering to this directive necessarily involves judgment in deciding when to "order evacuations" in a "proactive way."  Similarly, the Incident Decisions state that the Forest Service will maintain and enhance communication efforts with landowners and emphasize "accurate, timely and positive" information.  Again, there are no parameters on what form this communication is to take.  *Cf. Green*, 630 F.3d at 1252 (noting that Forest Service's communication was discretionary but failed to find root in policy).  For these reasons, the Government's communication, or lack thereof, with Plaintiffs was discretionary.

15

**B.     Policy Decision**

Because the decision not to contact Plaintiffs in advance of issuing an evacuation warning involved an element of choice, the next question is whether that conduct "reflects the exercise of judgment grounded in social, economic, or political policy." *Esquivel*, 21 F.4th at 575.  The Ninth Circuit's decisions in *Green* and *Esquivel* establish guideposts for the scope of the discretionary function in the context of claims based on the government's communications—or lack thereof—related to firefighting.

In *Green*, the plaintiffs owned land that was adjacent to an area in which a backburn was conducted, but the Forest Service did not inform them of the backburn or warn of the risk the backburn posed to their properties.  630 F.3d at 1248.  The lower court dismissed the *Green* plaintiffs' claims based on the application of the discretionary function but the Ninth Circuit reversed, concluding that there was no evidence in the record that policy analysis was needed when making the decision of whether to notify landowners of a nearby backburn and the associated risk.  *Id.* at 1252.  *Green* nonetheless left open the possibility that a communication decision could involve firefighting operations, *see id.* (providing example of deciding how to allocate personnel), creating the perfect springboard for *Esquivel*.

16

In *Esquivel*, the Forest Service communicated with a plaintiff and obtained his consent before igniting a burnout[4] on his property and implementing other defensive measures. 21 F.4th at 571. The fire crew left the site and returned the next day to discover the burnout fire had damaged 15 acres of the plaintiff's property. *Id.* at 572. The plaintiff sued, challenging the crew chief's "statements regarding the precautionary measures that the fire crew would take while conducting the burnout." *Id.* at 574, 575. As mentioned above, *Esquivel* clarified that because "decisions regarding whether and how to perform fire suppression operations are discretionary functions rooted in policy, the discretionary function exception extends to all other conduct 'based upon the exercise or performance' of these operations." *Id.* at 576. Thus, under *Esquivel*, "[a] communication between fire crews and property owners is . . . covered by the discretionary function exception under 28 U.S.C. § 2680(a) if such communication was based on the performance of fire suppression operations." *Id.* The relevant inquiry is whether the communication is "part of the decision to set, and the subsequent conduct of, the [backburn]—which is undisputedly a policy-based decision covered by the discretionary function exception." *Id.* In *Esquivel*, unlike *Green*, there was a fleshed out record.

---

[4] "A burnout fire . . . is a controlled, low-intensity fire that is designed to burn only the most flammable fuel sources (i.e., vegetation) near the fire line." *Esquivel*, 21 F.4th at 570 n.4.

17

Concerning the Residential Plaintiffs, the record shows that the decision to issue an evacuation warning was tied to the performance of fire suppression operations—so closely tied, in fact, that the evacuation order was issued seemingly as promptly as it could have been.  On August 16 at 9:00 p.m., the Team "held a meeting to discuss the day's observed fire behavior and what could be expected with the coming cold front."  (Doc. 34 at ¶ 66.)  Given information that, in the absence of firing operations the Fire would continue to expand toward residential areas, "[o]perations staff . . . recommended conducting firing operations along the established containment line" around O'Grady's property.  (*Id.* ¶ 73.)  The Team discussed the potential pros and cons of such operations, which included "the need for immediate evacuations of citizens in the area."  (*Id.* ¶ 75.)  One hour later, the Missoula County Sheriff's Office issued an evacuation order to the area that included the Residential Plaintiffs' residences, (*id.* ¶ 77), and InciWeb was updated to reflect the warning, (Doc. 31-27).

These events demonstrate that the evacuation warning was issued within one hour of the decision to conduct firing operations along the containment line, which necessarily means the issuance of the warning was based on the firing operations. The decision not to issue an evacuation warning, therefore, was also based in the exercise of these operations because such an insignificant amount of time elapsed between the Team meeting deciding on a course of action and the issuance of the

18

evacuation order that, as a practical matter,[5] there was no time for both a warning and an order to issue.  (*See* Doc. 34 at ¶¶ 66, 77.)

Furthermore, Plaintiffs here received some form of communication (i.e., the evacuation order), which distinguishes them from *Green* and moves them closer to the plaintiffs in *Esquivel*.  Like in *Esquivel*, the issuance of the evacuation order "was not an action separate and apart from the burnout itself."  21 F.4th at 577. Rather, while Plaintiffs desired communication that would have provided them with more time to evacuate, the Forest Service did communicate the need for an evacuation based on the Team's August 16 discussion of what fire suppression operations should be implemented.  Ultimately, the August 16 meeting illustrates that the Team considered "how to allocate its communications resources between community-wide distribution . . . and direct contact with private citizens," *Green*, 630 F.3d at 1252, and discussions concerning evacuations flowed directly from conversations about conducting firing operations, (Doc. 31-25 at 1–2).  The record here demonstrates that both prongs of the two-prong discretionary function inquiry are met for the Team's decision not to notify the Residential Plaintiffs significantly in advance of the evacuation order.

---

[5] The Forest Service's Manual recognizes the practical difficulties posed by wildland firefighting: "the nature of the wildland fire environment is often dynamic, chaotic, and unpredictable.  In such an environment, reasonable discretion in decision-making may be required."  (Doc. 31-8 at 2 (quoting FSM § 5107)); *see also Esquivel*, 21 F4th at 575 (quoting same).

Plaintiff O'Grady presents a slightly different inquiry, but ultimately the discretionary function applies to his claims as well. O'Grady argues that "[t]he [Forest Service] failed to inform or notify him" of the planned firing operations to be conducted on his property. (*O'Grady*, Doc. 1 at ¶ 26.) The Government admits that it did not contact O'Grady personally, but "communicated the plan to private landowners near the proposed firing operation and continued to communicate with the public through the established communications strategy, including via InciWeb." (Doc. 34 at ¶ 51.) The Government offers no explanation for why O'Grady was not contacted, aside from plainly stating that O'Grady is a resident of Colorado and was residing there. (*Id.* ¶ 21.) Nonetheless, the Forest Service's decision not to notify O'Grady before conducting firing operations on his land was also rooted in policy because, unlike the situation in *Green*, the record shows the Forest Service's conduct was tied directly to broader fire suppression efforts. Moreover, it is not clear what notice would have achieved as O'Grady did not have any structures or improvements and Montana law authorizes firefighting on private land to suppress wildfires. Mont. Code Ann. § 76–13–104(1)(a). This statute is also silent as to whether any notice or warning is required to the private landowners. In any event, because such notice or warning would be "based upon" fire suppression efforts, that communication falls within the discretionary function. *See Esquivel*, 21 F.4th at 576.

## C.  Conclusion

The discretionary function applies to the Forest Service's communication (or lack thereof) because the communication decisions were based on policy-rooted fire suppression activities.  As a result, summary judgment is granted in the Government's favor as to all of Plaintiffs' negligence and intentional tort claims.

## II.  Intentional Torts

Beyond the application of the discretionary function, Plaintiffs' intentional tort claims suffer from other problems that warrant summary judgment in the Government's favor.  Plaintiffs generally allege three categories of intentional torts—trespass, conversion and emotional distress.  All Plaintiffs allege intentional and negligent trespass, while all Residential Plaintiffs allege conversion.  Additionally, all Plaintiffs allege negligent infliction of emotional distress, but only Mrs. Schurg, Mrs. Miller, Lowe, and Michelle Stermitz continue to allege intentional infliction of emotional distress.  (Doc. 23 at 29.)

### A.  Intentional Trespass

Underlying Plaintiffs' claims for intentional trespass is the allegation that the Forest Service lit the fires that entered Plaintiff's land.  (*See* Doc. 23 at 17.)  "Modern common law trespass is an intentional tort claim for damages caused by an unauthorized entry or holdover upon real property of another."  *Davis v. Westphal*, 405 P.3d 73, 81 (Mont. 2017).  The essential elements of an intentional trespass claim are: "(1) an intentional entry or holdover (2) by the defendant or a

thing; (3) without consent or legal right." *Id.* The party asserting a claim for intentional trespass need not establish any sort of specific intent on the part of the tortfeasor and need only prove "that the tortfeasor intentionally entered or remained, or caused a third party or thing to enter or remain, upon the property of another regardless of the tortfeasor's knowledge, lack of knowledge, or good faith mistake." *Id.* at 82. Here, Plaintiffs have failed to meet their burden of showing that an intentional trespass occurred because they do not establish any intent, nor do they establish the Forest Service lacked the legal right to enter the properties.

### 1. O'Grady

O'Grady's intentional trespass claim fails because he cannot demonstrate that the Government lacked permission to enter his property. The Government acknowledges that the first and second elements of intentional trespass are met because the Team knew it was entering private property, and it then conducted firing operations on that property. (Doc. 18 at 15; *see also* Doc. 19 at ¶ 21.) Thus, given that O'Grady did not consent to the government's presence on his land, the only issue is whether the Forest Service had a legal right to enter O'Grady's property. It did.

Under § 76–13–104(1)(a), the Montana Department of Natural Resources and Conservation "has the duty to ensure the protection of land under state and private ownership and to suppress wildfires on land under state and private ownership." Additionally, the statute states that "[t]he department may engage in

wildfire initial attack on all lands if the fire threatens to move onto state or private land." § 76–13–104(1)(b).  Plaintiffs argue that the evidence shows that the Forest Service was intentionally setting fires to O'Grady's land, which is inconsistent with the "duty . . . to suppress wildfires," and so the Forest Service's presence was unauthorized under § 76–13–104(1)(a).  (Doc. 23 at 11.)  Similarly, according to Plaintiffs, § 76–13–104(1)(b) did not authorize Plaintiffs' presence on O'Grady's land because the Forest Service's firing operations were well beyond the window of "initial attack."  (*Id.*)

As an initial matter, § 76–13–104 is relevant even though the Montana Department is not a party because it extended firefighting authorization to the Team that was on O'Grady's land via a delegation of authority on August 3, 2017, (Doc. 18-15), and August 16, 2017, (Doc. 18-16).  The Government and Plaintiffs agree that the Team was present on O'Grady's land between August 14 and August 17, 2017.  (*See* Doc. 32 at ¶¶ 20, 27.)  Thus, the Forest Service's presence on O'Grady's property was authorized by statute so long as the Forest was acting pursuant to its duty to suppress wildfires or was engaging in wildfire initial attack consistent with § 76–13–104(1)(a) or (b).  Contrary to Plaintiffs' assertion otherwise, the Forest Service was engaged in fire suppression.

In an Incident Status Summary dated August 11 and 12, the Team described current and predicted weather conditions and the probable effect of those conditions on the Fire in the area around O'Grady's property.  (*See generally* Doc.

23

21-12.)  The summary stated, "With potential for active to extreme fire behavior due to a forecasted critical fire weather pattern and cold frontal passage, the need to strategically introduce fire in a limited fashion will be necessary to reduce the probability of high intensity fire impacting residences and other high value resources."  (*Id.* at 6–7.)  Accordingly, on August 14, the Team decided to conduct aerial and hand firing operations along a section of O'Grady's property.  (Doc. 32 at ¶ 20.)  The Incident Status Summary dated for August 14 and 15 authorized the Team to "[u]tilize Ariel [sic] and hand lighting techniques w[h]ere feasible to manage growth."  (Doc. 21-14 at 7.)  However, no firing operations actually occurred on August 14 or 15.  (*See* Doc. 32 at ¶¶ 24–29.)

The parties agree that firing operations began on O'Grady's property on August 17.  (*Id.* at ¶ 33.)  As evidenced by the Incident Status Summaries, these operations were undertaken in an attempt to control the spread of the Fire—*i.e.*, consistent with the statutory duty to suppress wildfire under § 76–13–104(1)(a).  Given that the Team's presence was authorized by the Montana Department's delegation and that the Team was engaged in firefighting activities, the Team had a legal right to be on O'Grady's property.  Additionally, though O'Grady argues that the Team had his contact information and should have contacted him for his consent to utilize firing operations, the elements of intentional trespass require a lack of consent *or* lack of legal right to be on the property at issue.  Here, the Team

had a legal right to be present on O'Grady's property and so his lack of consent is not dispositive.

### 2. Residential Plaintiffs

Residential Plaintiffs' claims fail because they cannot show intent. The facts show that the Forest Service conducted firing operations near the Residential Plaintiffs' properties, but that the weather conditions moved the fire onto the properties. Additionally, Plaintiffs' argument that the Forest Service is liable for a failure to remove the fire is unpersuasive because the authority on which Plaintiffs rely is inapposite.

As a preliminary matter, Plaintiffs are correct that their subjective beliefs are irrelevant to the inquiry. (Doc. 23 at 18); *cf. Davis*, 405 P.3d at 82. While many of the Residential Plaintiffs testified that they did not believe the Forest Service intended the fire to enter or damage their property, (*see, e.g.*, Doc. 31-38 at 31; Doc. 31-37 at 32; Doc. 31-35 at 16), this testimony does not fatally undermine the Residential Plaintiffs' claims because it does not bear on what the alleged tortfeasor—the Forest Service—intended. Plaintiffs' intentional trespass claims fail because there are no facts to show that the Forest Service intended to either light a fire on the Residential Plaintiffs' properties or intended the fire to travel onto those properties.

To support their arguments about intent and causation, Plaintiffs rely on reports from Poncin that note firing operations began in the afternoon of August 17

near the properties, and by later in the evening, the fire had "spotted across the containment line into [Plaintiffs'] subdivision." (Doc. 22 at ¶ 33.)  However, this report merely shows that the Forest Service started a fire through firing operations on August 17, and it does not show that the Forest Service started that fire on Plaintiffs' properties or that it intended the fire to travel onto Plaintiffs' properties. Rather, the evidence shows the Forest Service was actively trying to keep the fire away from Plaintiffs' properties.  Testimony from Morgan Dale, a special agent with the Forest Service, (Doc. 21-38 at 5), describes that the fire "spotted across the mechanical, or dozer, line" into Plaintiffs' subdivision, (Doc. 18-11 at 3). Plaintiffs themselves characterize the fire's movement this way. (*See* Doc. 22 at ¶ 33.)  Dale explained that this process means the fire crossed a manmade fire line via embers traveling through the air.  (Doc. 18-11 at 3.)  This kind of environmentally driven movement does not satisfy the element of intent, which requires "that the tortfeasor intentionally entered or remained, or caused a third party or thing to enter or remain, upon the property of another." *Davis*, 405 P.3d at 82.  The facts—and Plaintiffs' own characterization—describe the fire as having "spotted" onto the Residential Plaintiffs' properties.  That movement means the weather conditions, not the Forest Service, caused the fire to enter onto the properties.

Plaintiffs also argue that the Forest Service's failure to take action to remove the fire from the properties creates liability. (*See* Doc. 23 at 16–17.)  Plaintiffs rely

on *Guenther v. Finley*, 769 P.2d 717, 719 (Mont. 1989) for support. Under

*Guenther*, a person is liable for trespass "if he intentionally (a) enters land in the

possession of the other, or causes a thing or a third person to do so, or (b) remains

on the land, or (c) fails to remove from the land a thing which he is under a duty to

remove." *Id.* According to Plaintiffs, the Forest Service had a duty to remove the

fire from the properties because it allowed the fire to travel onto those properties.

However, as discussed above, the facts show that the Forest Service was actively

trying to prevent the fire from traveling onto Plaintiffs' properties. (*See* Doc. 21-

38 at 5.) Furthermore, given the character of this Fire and the weather, it is

difficult to see how the fire could have been removed.

Additionally, *Guenther* embraced a definition of "intent" requiring proof

that "the actor desires to cause the consequences of his act, or that he believes that

the consequences are substantially certain to result from it." 769 P.2d at 719

(quotation marks omitted).[6] The evidence shows that the Forest Service was trying

to contain the fire, not expand it onto Plaintiffs' properties. Consequently, the

Residential Plaintiffs' intentional trespass claims fail.

### B. Negligent Trespass

To prove negligent trespass, a plaintiff must show: (1) the tortfeasor

recklessly or negligently (2) entered or caused a thing or third person to enter the

---

[6] In any event, the applicability of *Guenther* is questionable because no specific
intent is required for intentional trespass. *See Davis*, 405 P.3d at 82

land of another and (3) the presence of the tortfeasor, thing, or third person caused harm to the land, the possessor, or to a thing or third person in whose security the plaintiff has a legally protectable interest. *See Olsen v. Milner*, 276 P.3d 934, 940 (Mont. 2012). Here, the record includes several Plaintiffs' administrative claim statements that cite the elements of negligent trespass. (*See* Doc. 23-11 at 7; Doc. 23-15 at 4; Doc. 23-16 at 4; Doc. 23-17 at 4.) However, these statements are excerpted, and none of the portions included in the record provide any facts related to the claims. In each Complaint, the claims are grounded in the allegation that "[t]he [Forest Service] recklessly or negligently, and as a result of abnormally dangerous activity, lit fires that entered Plaintiff's land." (*See, e.g.*, Doc. 1 at ¶ 60.) Nonetheless, the briefing on other claims with overlapping elements indicates that it is undisputed that Plaintiffs owned the properties at issue and those properties were damaged by fire. (*See* Doc. 19 at ¶ 21; *see also See* Doc. 23 at 19.) Thus, the only remaining elements at issue are whether the Forest Service acted negligently or recklessly and whether that conduct caused the fire to enter Plaintiffs' land.

It is a given that the Forest Service conducted firing operations on O'Grady's land. (*See* Doc. 18 at 15; Doc. 19 at ¶ 21.) Thus, for Plaintiff O'Grady, the second element of negligent trespass is satisfied. However, O'Grady's negligent trespass claim fails because the discretionary function applies, which means he cannot pursue a claim rooted in the Forest Service's allegedly negligent or reckless actions. Where the discretionary function retains the government's

28

sovereign immunity, that immunity applies to claims that arise out of the immunized conduct, and a plaintiff cannot circumvent immunity through creative pleading. *Cf. Saint-Fleur v. Barretto*, 2019 WL 2207670, at *5 (E.D. Cal. May 22, 2019) (citing *Safford Aviation Serv., Inc. v. United States*, 14 F. App'x 945, 946 (9th Cir. 2001)); *Adams v. United States*, 188 F. App'x 571 (9th Cir. 2006). Because the Forest Service's decision to conduct firing operations is immunized, O'Grady cannot use that decision to satisfy the first element of negligent trespass.

In addition to similar problems with the first element, the Residential Plaintiffs' negligent trespass claims fail because they cannot show that the Forest Service caused the fire to enter onto their land. As explained above, the record indicates that the fire progressed onto the Residential Plaintiffs' properties due to spotting. (*See* Doc. 18-11 at 3; Doc. 22 at ¶ 33; Doc. 18-11 at 3.)

### C. Conversion

O'Grady does not bring a conversion claim, and the Residential Plaintiffs' claims for conversion fail for much of the same reason their intentional trespass claims fail. To prove a claim for conversion, the party asserting the claim must prove: "(1) a claimant's right of possession or control over the subject personal property; (2) the intentional exercise of possession or control over the property by another inconsistent with the right of the owner and without right or consent; and (3) resulting damages to the claimant." *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 591 (Mont. 2018). While it is undisputed that the Residential Plaintiffs

29

owned the property at issue or that they sustained property damage, (*see* Doc. 23 at

19), conversion is concerned with personal—rather than real—property, *see*

*Associated Mgmt. Servs.*, 424 P.3d at 591. Thus, in addition to questions

concerning whether all Residential Plaintiffs sustained injury to their personal

property, it remains that these Plaintiffs cannot show the requisite intent to support

their conversion claims.

In support of intent, Plaintiffs argue that the Forest Service knew "the fire

was on and damaging Plaintiffs' land as firefighters were present and able to see it

with their own eyes" and "the [Forest Service] had a duty to remove the fire it had

lit." (Doc. 23 at 20.) These arguments are based in part on Mont. Code Ann.

§§ 50–63–103 and 27–1–701, under which Plaintiffs argue that the Forest Service,

if it were "a private individual," "would be under a duty to remove the fire that

they allowed to travel onto Plaintiffs' land." (*Id.* at 17.) In addition to the

infirmity that these arguments focus on real, rather than personal, property, these

arguments also fail for the reasons the Government identifies.

First, as discussed above, there is no evidence that the Forest Service either

lit the fire on the Residential Plaintiffs' properties or that it allowed the fire to

travel onto those properties. The record shows that the Forest Service was actively

trying to prevent the spread of the fire onto Plaintiffs' properties. (*See, e.g.*, Doc.

12-18 at 3–6 (describing containment and management objectives for MacIntosh

Manor area); Doc. 32 at ¶ 33 (describing documentation of firefighting efforts on

30

August 17).)  Accordingly, liability under § 50–63–103 does not attach because that statute imposes liability on "a person who sets or leaves a fire that spreads and damages or destroys property."

Second, while the allegation that firefighters did nothing to help certain Plaintiffs—particularly, the Schurgs—is troubling, Plaintiffs fail to establish how this alleged ambivalence gives rise to liability under conversion.  Even under § 27–1–701, which imposes liability for "the results of the person's willful acts [and] also for an injury occasioned to another by the person's want of ordinary care or skill in the management of the person's property or person," any inaction by the Forest Service does not demonstrate that the Forest Service "intentionally exercised possession or control" over Plaintiffs' personal property.  At most, the alleged inaction may demonstrate negligence, but as the Government points out, intentional torts by their very nature cannot be supported by conduct that is merely negligent.  As a result, the conversion claims fail.

### D.    Intentional Infliction of Emotional Distress

Only four plaintiffs continue to allege intentional infliction of emotional distress: Mrs. Schurg, Mrs. Miller, Jackie Lowe, and Michelle Stermitz.  (Doc. 23 at 29.)  These Plaintiffs allege claims for intentional infliction of emotional distress as standalone causes of action.  (*See* Doc. 1 at ¶¶ 71–84; (*Miller*, Doc. 1 at ¶¶ 48–55); (*Lowe*, Doc. 1 at ¶¶ 39–48); (*Stermitz II*, Doc. 1 at ¶¶ 45–54).)

### 1. Legal Standard

The parties expressed disagreement about the proper legal standard for assessing emotional distress claims under Montana law, (*see* Doc. 23 at 20; Doc. 28 at 14–15), and both are somewhat correct. Since *Sacco v. High Country Independent Press*, 896 P.2d 411, 427 (Mont. 1995), and consistent with the Plaintiffs' framing of the issue, the Montana Supreme Court has stated that an independent action for intentional infliction of emotional distress "arises when a plaintiff suffers serious and severe emotional distress as a reasonably foreseeable consequence of a defendant's intentional act or omission." *Czajkowski v. Meyers*, 172 P.3d 94, 101 (Mont. 2007). And, consistent with the Government's arguments, *Czajkowski* clarified that the "extreme and outrageous" nature of a tortfeasor's conduct is a measure by which the severity of the emotional distress may be proved. *Id.* Thus, while "extreme and outrageous conduct" is not a prima facie element of an intentional infliction of emotional distress claim, such conduct must be the root cause of the requisite severe emotional distress. *See id.* Under this standard, these Plaintiffs' claims fail.

### 2. Extreme and Outrageous Conduct

"Extreme and outrageous conduct" is conduct that goes "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Czajkowski*, 172 P.3d at 101 (quotation marks omitted). The Government is correct that the record does not establish any extreme or

outrageous conduct for three of the four remaining Plaintiffs' claims of serious or severe emotional distress, and the other remaining Plaintiff's claim—that of Michelle Schurg—fail on the "serious or severe" inquiry.

First, three of the remaining Plaintiffs, Mrs. Miller, Jackie Lowe, and Michelle Stermitz, do not allege extreme or outrageous conduct in support of their allegedly severe or serious emotional distress, and the record does not support that such conduct exists. The questioned conduct underlying these Plaintiffs' emotional distress claims is the Forest Service's firing operations and evacuation order. (*See* Doc. 23 at 23–26.) Miller's administrative claim statement describes her anxiety, frustration, and devastation of having to evacuate herself and her animals in the middle of the night, return to a radically altered landscape, and ultimately rehome her animals because they could not live on the burned property. (Doc. 23-12 at 3–4.) At her deposition, Miller stated the cause of her emotional distress was "specifically[,] the evacuation process itself and just the emotions that were involved in going through that, being woken in the way that we were in a state of panic and dealing with evacuating the animals." (Doc. 31-30 at 16; *see also id.* at 17.)

Similarly, Lowe and Michelle Stermitz's allegedly serious or severe emotional distress is based on the loss of their respective homes as a result of the Forest Service's actions. (Doc. 23 at 23–24, 26.) In her administrative claim statement, Michelle Stermitz identified the Forest Service's firing operations as the

basis of her emotional distress.  (Doc. 23-13 at 7.)  At her deposition, Michelle

Stermitz stated that the frenzied nature of the evacuation contributed significantly

to the emotional distress she felt.  (Doc. 31-34 at 20, 21.)  In her administrative

claim statement, Lowe, too, described the Forest Service's firing operations as the

basis for her emotional distress.  (Doc. 23-14 at 3–4.)  At her deposition, Lowe

spoke at length about the emotional distress she has felt over the fact that her house

burned down, (Doc. 31-32 at 30, 31), and she stated she felt the Forest Service was

"lying by omission" by not notifying her of her home's designation and not

providing earlier evacuation notice, (*id.* at 9).

Assuming *arguendo* the evacuation and subsequent rehoming of animals

underlying the three remaining Plaintiffs' alleged distress stemmed from the Forest

Service's conduct related to the Fire, such conduct prompting the evacuation and

rehoming is not "extreme or outrageous."  While these Plaintiffs claim to have

been deeply upset by the Forest Service's failure to notify them of their homes'

designations as a result of the structural assessments, they admit that such

assessments are created for the purpose of assisting firefighters in residential areas

and such assessments are not public documents.  (Doc. 34 at ¶¶ 32–33.)  Because

these designations are not required to be made public, Plaintiffs cannot claim that

their non-receipt of such designations is "utterly intolerable in a civilized

community."  *Cf. Czajkowski*, 172 P.3d at 101.  Additionally, while the evacuation

notice may have left these Plaintiffs with very little time to leave the premises,

there is nothing in the record to suggest that the timing of the Forest Service's notice was "beyond all possible bounds of decency" given Plaintiffs' own description of the threat to Plaintiffs' properties as emerging the same day the evacuation order issued. (*See* Doc. 34 at ¶ 77.) Thus, because Miller, Michelle Stermitz, and Lowe fail to show that extreme or outrageous conduct occurred, they necessarily cannot show that their emotional distress was serious or severe. *See Czajkowski*, 172 P.3d at 101. The Montana Supreme Court holds that it is the function of the trial court to determine if the claimed extreme emotional distress is viable. *See Sacco*, 896 P.2d at 425.

Mrs. Schurg's claim for intentional infliction of emotional distress is slightly different. Schurg points to different conduct underlying her allegedly severe or serious emotional distress: that she fought the fire on her own property, apparently while firefighters looked on and did nothing to help. (Doc. 24 at ¶ 43.) The Government does not argue that such inaction could or could not constitute extreme and outrageous conduct, but rather states that the record shows the "firefighters simply doing their level best to control and contain a wildly variable and volatile forest fire." (Doc. 28 at 16.) But there are facts in the record that contradict the Government's narrative, at least as to the Schurgs' property.

In her administrative claim statement, Schurg described that while she and her husband fought the fire, "three fire trucks full of fire personnel lined the road directly below their home. The personnel did not have the fire hoses out or pumps

running, instead they looked on." (Doc. 23-11 at 5.) "At one point, Mr. Schurg

ran down and pleaded for their assistance. The Forest Service did nothing." (*Id.*)

In her deposition, Mrs. Schurg described "minimal firefighting efforts," (Doc. 31-

38 at 39), and how some of her emotional distress was grounded in "the fact that

the three of us saved our house, and then to look down below our house on the

road and see all these firefighters standing next to their trucks watching, watching

everything we did to save our house," (*id.* at 26). In its reply brief, the

Government implicitly concedes some degree of truth to Schurg's description of

events by describing the events as "fire professionals [] already using a commercial

pump and firehose to eliminate fire wherever it approached the Schurg property."

(Doc. 28 at 10.) The "fire professionals" to whom the Government refers are,

apparently, Mr. and Mrs. Schurg.

  While there is no authority directly addressing whether firefighters' failure

to combat fire is "extreme and outrageous," other authority suggests it could meet

that definition. For example, the codification of a firefighting duty in § 76–13–

104(1)(a) suggests that the public could find it "utterly intolerable" that a

firefighting unit would not aid civilians fighting a fire on their property.

Additionally, the Montana Supreme Court recognized the important public policy

of fighting fires, equating the suppression of fire with a furtherance of the public

good. *See Stocking v. Johnson Flying Serv.*, 387 P.2d 312, 317 (Mont. 1963).

Ultimately, the alleged failure of a firefighting unit to fight a fire could be viewed

as extreme and outrageous conduct. Given this factual discrepancy, the seriousness or severity of Schurg's alleged emotional distress is considered.

### 3. Serious or Severe

An independent cause of action for intentional infliction of emotional distress "arises when a plaintiff suffers serious and severe emotional distress as a reasonably foreseeable consequence of a defendant's intentional act or omission." *Czajkowski*, 172 P.3d at 101. But to reach the foreseeability question, it must be established that the emotional distress is "serious or severe," which requires an examination of the intensity and duration of the distress. *See id.* A court may grant summary judgment if there is no evidence to support severe or serious emotional distress. *See Renville v. Fredrickson*, 101 P.3d 773, 777 (Mont. 2004).

"In cases where there is a physical manifestation of bodily harm resulting from emotional distress, such as PTSD, this bodily harm is sufficient evidence that the emotional distress suffered by the plaintiff is genuine and severe." *Henricksen v. State*, 84 P.3d 38, 55 (Mont. 2004). Schurg argues that her diagnosis of PTSD is independently sufficient to, at the very least, preclude summary judgment at this stage. (Doc. 23 at 23; *see also* Doc. 23-19.) However, the Government distinguishes *Henricksen* on the basis that there is no expert testimony or other evidence in the record that Schurg's PTSD involved "physical components" that would make it analogous to the PTSD at issue in *Henricksen*. (Doc. 28 at 11.) The note from Schurg's therapist supports this distinction. The note indicates that

37

Schurg was seen three times in September 2017, and "[a]t the conclusion of these sessions her symptoms appeared to be relieved, and she was discharged at that time." (Doc. 23-19.) Thus, the medical evidence shows that Schurg's PTSD did not last for a significant duration. And the other symptoms to which Schurg points to as evidence of the severity of her emotional distress—loss of relationships, lack of sleep, anxiety, and employment difficulties—are not so severe or serious that no reasonable person could be expected to endure them. *Cf. Renville*, 101 P.3d at 776–77 (concluding that Plaintiffs' loss of child was not so serious or severe that no reasonable person could be expected to endure it). As a result, Schurg's claim of intentional infliction of emotional distress fails as well.

### E. Negligent Infliction of Emotional Distress

"An independent cause of action for negligent infliction of emotional distress will arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's act or omission." *Sacco*, 896 P.2d at 425. The Montana Supreme Court emphasized that "[t]he requirement that the emotional distress suffered as a result of the defendant's conduct be 'serious' or 'severe' ensures that only genuine claims will be compensated." *Id.* On the standard articulated in *Sacco*, a plaintiff pursuing an independent negligent infliction of emotional distress claim must show (1) the emotional distress he suffered was serious or severe and (2) the reasonably foreseeable consequence of (3) the defendant's act or omission. *See id.*

38

Here, Plaintiffs do not explicitly address the negligent infliction of emotional distress claims, but argue that "Plaintiffs['] emotional distress was caused by the [Forest Service's] actions in lighting the fires that ultimately destroyed Plaintiffs' property without providing notice to the Plaintiffs." (Doc. 23 at 20–21.)  Plaintiffs state this emotional distress was the "reasonably foreseeable consequence of [the Forest Service's] actions."  (*Id.* at 21.)  The Forest Service does not address negligent infliction of emotional distress but disputes the seriousness and severity of Plaintiffs' alleged emotional distress, as noted above.

Summary judgment for the Government is appropriate for two reasons. First, the record shows that the claimed emotional distress of the four Plaintiffs discussed above does not meet the requirements for "serious" or "severe."  For this reason alone, the negligent infliction of emotional distress claims advanced by Mrs. Schurg, Mrs. Miller, Lowe, and Michelle Stermitz are insufficient. Additionally, the evidence in the record does not provide any support to the remaining Plaintiffs' claims that their emotional distress is serious or severe.  Even giving these Plaintiffs the "benefit of all reasonable inferences," the dearth of record evidence demonstrating the seriousness or severity of these Plaintiffs claims indicates summary judgment in the Government's favor is appropriate.

Second, and more broadly, Plaintiffs' negligent infliction of emotional distress claims fail to the extent they are rooted in the Forest Service's lack of notice of planned firing operations.  (Doc. 23 at 20–21.)  The decision to provide

39

or not provide notice is discretionary; consequently, that decision is immunized by the discretionary function. As a result, the negligent infliction of emotional distress claims fail because they attempt to impose liability for conduct that the discretionary function has insulated from suit.

## CONCLUSION

The discretionary function applies, and the Government is entitled to summary judgment. Accordingly, IT IS ORDERED that the Clerk is directed to enter judgment consistent with this Order and the Court's January 26, 2022 Order, (*see* Doc. 57), and close the case.

DATED this 8th day of February, 2022.

12:00 p.m.

Donald W. Molloy, District Judge
United States District Court

40